UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,                    :

     - v. -                                           :

MATTHEW TEEPLE,                               :

               Defendant.            :

                           13 Cr. 339 (RPP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## GOVERNMENT'S SENTENCING SUBMISSION

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York  10007

Telemachus P. Kasulis
Sarah E. McCallum
Assistant United States Attorneys

Michael P. Holland
Special Assistant United States Attorney
   -- Of Counsel --

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Matthew Teeple ("Teeple"), which is scheduled for October 16, 2014, at 2:00 p.m.  For the reasons that follow, a sentence of 60 months' imprisonment calculated pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") – and expressly stipulated to by both parties in the plea agreement –  is appropriate in this case.

From 2005 to 2009, Teeple engaged in a protracted scheme to obtain and use inside information provided to him by co-defendant David Riley ("Riley"), who was then the Chief Information Officer at Foundry Networks, Inc. ("Foundry").  First while working at a consulting service called the Field Check Group, and then while employed at hedge fund Artis Capital Management, L.P. ("Artis"), Teeple sought and obtained from Riley confidential information that Foundry required its employees to keep secret from the investment community. Time and again, Teeple got from Riley Foundry's confidential worldwide sales information before it was conveyed to the public in quarterly earnings announcements.  Teeple provided that information to Artis, which used the inside edge that Teeple supplied to make millions of dollars trading in advance of the relevant public announcements.  And on July 16, 2008, Teeple learned from Riley Foundry's most closely-guarded secret: that in five days' time, Foundry would announce that it was going to be acquired by Brocade Communications Systems, Inc. ("Brocade") at a particular price per share.  Again, Teeple provided this information to Artis. And Artis—armed with this material, nonpublic information that the rest of the market did not have—traded extensively in Foundry securities, making profits and avoiding losses in excess of $20 million.

Artis was not the only beneficiary of Teeple's illegal inside edge concerning the Brocade deal. Within minutes of learning about the deal from Riley, Teeple began calling his extensive network of friends, colleagues, and contacts at publicly-traded companies. On July 16, 2008 alone, Teeple called fifteen different people, all of whom began purchasing Foundry stock or call options—some while still on the phone with Teeple. All of those individuals made money when the Brocade deal was announced to the public. In part because of this brazen conduct, the Court should reject Teeple's claim that he is less culpable than the defendants in other insider trading cases with whom he seeks to draw comparisons. Indeed, in view of the sustained and repeated character of Teeple's fraud, his cultivation of sources inside publicly-traded companies, and his promiscuous passage of inside information to Artis and his web of contacts and associates, Teeple's conduct places him at the far end of the culpability spectrum from those whose conduct might fairly be characterized as isolated.

Teeple has pled guilty to participating in this conspiracy to commit insider trading by using the inside information he received about Foundry to enrich his employer and himself. As part of that agreement, the Government has agreed to dismiss at sentencing the remaining substantive insider trading counts against Teeple in the operative indictment. In exchange, both the Government and Teeple have agreed not to seek any sentence other than 60 months' imprisonment in connection with this crime. The contemplated 60-month sentence is appropriate and consistent with both the Guidelines and the factors underlying 18 U.S.C. § 3553(a), given Teeple's repeated efforts to obtain and use inside information during the four-year period from 2005 through 2009.

## STATEMENT OF FACTS

On February 20, 2014, a grand jury sitting in this District returned Superseding Indictment S1 13 Cr. 339 (RPP) (the "Indictment"), which charged Teeple in four counts. Count One charged Teeple with participating in a conspiracy to commit securities fraud through insider trading from 2005 through June 2009, in violation of 18 U.S.C. § 371. Counts Two, Three, and Four each charged Teeple with substantive insider trading crimes in April 2008, July 2008, and October 2008, respectively, in violation of 15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. On May 28, 2014, Teeple entered a plea of guilty to Count One of the Indictment pursuant to a plea agreement with the Government. In the plea agreement, Teeple and the Government agreed that neither party would seek any sentence other than 60 months' imprisonment at the time of sentencing. As he acknowledged during his allocution, Teeple received from Riley on several occasions in 2008 confidential Foundry financial information and secrets about Brocade's acquisition of Foundry. Teeple admitted that he understood that Riley was providing this information to him in breach of his duties to Foundry and in exchange for a personal benefit from Teeple. Teeple then acknowledged passing that inside information to Artis, which used it to make illegal trades in the stock market to the tune of tens of millions of dollars.

### A.    Teeple Engaged in Insider Trading While Working at the Field Check Group

Despite Teeple's focus on his criminal acts in 2008, his Foundry-related insider trading activity in fact began much earlier.

Between 2003 and the fall of 2007, when Teeple joined Artis, Teeple was employed as an analyst for the Field Check Group, a two-man technology consulting firm located in Menlo Park, California that served a handful of hedge and mutual fund clients,

including Artis.  Presentence Report ("PSR") ¶ 74.  While at the Field Check Group, Teeple

furnished Artis and other clients with advice related to computer and technology hardware

companies.  To enhance his value to clients, and thus advance his own career, Teeple maintained

and cultivated an extensive cadre of contacts in Silicon Valley.  He used those contacts to obtain

information which he then passed along to Field Check Group clients.

      One of Teeple's contacts was Riley.  Teeple and Riley had met while working

together at a company called Riverstone Networks in the early 2000s.  In 2005, Riley began

working as Foundry's CIO and Vice President in charge of Information Systems and Information

Technology.  That very same year, Riley began furnishing Teeple with confidential information

about Foundry.  From the outset, Teeple began conveying this inside information to at least one

of the Field Check Group's clients, the Boston Company.

      Teeple's primary contact at the Boston Company was John Johnson, a witness

who has entered into a cooperation agreement with the Government and who testified at the

recent trial against Riley before the Honorable Valerie E. Caproni.[1]  As Johnson testified at that

trial, the Field Check Group specialized in speaking to individuals at publicly-traded companies

that otherwise should have been off-limits to the investment community.  (Tr. 68-70).[2]  Teeple,

while working at the Field Check Group, provided Johnson with financial figures related to

companies' quarterly results before those numbers became public.  (Tr. 70).  The Boston

---

[1]    On March 18, 2013, Johnson pled guilty, pursuant to his cooperation agreement with the Government, to (1) conspiring to commit insider trading based on Teeple's information from in or about 2005 through in or about 2009, and (2) committing insider trading based on Teeple's tip that Brocade would acquire Foundry in July 2008.  He has not yet been sentenced.

[2]    "Tr." citations are to the transcript of Riley's trial.  Trial began on September 8, 2014 and concluded on October 2, 2014, when the jury returned a verdict of guilty on Counts One, Two, and Three of the Indictment.  The jury deadlocked on Count Four, related to Artis' trading in Foundry securities in October 2008, and was unable to reach a verdict.  A courtesy copy of the complete trial transcript has been provided to the Court.

Company used Teeple's information to build models so as to better predict what the quarterly earnings announcements for those companies would be, so they could trade accordingly.  (Tr. 71).

One of the companies about which Teeple furnished Johnson with material, non-public financial information from 2005 through September 2007 was Foundry.  (Tr. 80, 87).  In advance of Foundry's quarterly earnings announcements, Teeple provided Johnson with worldwide and regional "bookings" figures, which are essentially sales numbers for the company before the accounting department determines how much of that money can be realized as actual revenue. (Tr. 81-82).  Bookings information was valuable to a potential investor in Foundry because it directly related to the revenue figure that would be ultimately reported to the public in an earnings announcement.  (Tr. 82-83).  Teeple also provided Johnson with confidential information about the guidance Foundry was expected to give on a forthcoming earnings call, as well as information as to how large a "backlog" of products the company had at any given time. (Tr. 83-86).

This valuable sales information was plainly non-public.  (Tr. 86).  Foundry employees were not permitted to disclose it because it was inside information.  (Tr. 86).  The Boston Company, however, was happy to pay Teeple for this information because Teeple had his inside source at Foundry, Riley.[3]

Teeple and Johnson worked out a system to communicate this inside information

---

[3]     Johnson also testified that Teeple routinely provided him with inside information related to the activities of Marvell Technology Group ("Marvell"), a publicly-traded semiconductor company.  (Tr. 76-77).  Teeple gave Johnson nonpublic revenue, gross margin, and bookings information, as well as insight into guidance the company would provide and recent product design wins.  (Tr. 77).  As with the Foundry information, Johnson confirmed that the information Teeple provided about Marvell could only have come from within the company and would have been unavailable to the public at large because it was inside information.  (Tr. 78).

so as to minimize the chance that they would be caught by the compliance department or law enforcement.  The two never used corporate e-mail accounts to communicate, instead typically talking over the telephone or occasionally using personal e-mail accounts.  (Tr. 91-92).  They also occasionally met face-to-face, despite the fact that Johnson lived in Colorado and Teeple in California.  (Tr. 73).

With the notable exception of the Foundry acquisition tip in July 2008, Johnson never received material, non-public information from Teeple again after September 2007.  That is because in October 2007, Teeple went to work for Artis.

### B.  Teeple Continued to Engage in Insider Trading After Joining Artis Capital

In October 2007, Artis recruited Teeple away from the Field Check Group to serve as an in-house analyst for the hedge fund.  In all meaningful respects, Teeple's job description did not change, only now Teeple was providing information to a single investor rather than to the Field Check Group's larger client base.  (Tr. 93; *see also* Defendant Matthew Teeple's Sentencing Memorandum ("Teeple Mem.") at 9).  As Johnson understood it, Artis wanted to keep Teeple's information "solely to themselves, rather than going to the 8 to 10 [clients of the Field Check Group].   Information is more valuable when you have it first, and not disseminated to everyone else."  (Tr. 94).

Teeple's value to Artis was reflected in the signing bonus he received immediately upon joining the fund in the fall of 2007: $2 million.  (*See* Exhibit A hereto (Teeple annual compensation chart)).  Teeple also received a bonus of a little over $1 million in 2008 and a little under $2 million in 2009, to go along with a base salary of $250,000 per year.  (*See id.*).  In addition to requiring that Teeple provide information exclusively to Artis, Artis also prohibited Teeple from trading securities in his personal accounts or encouraging any family

members to do so.  (*See* Exhibit I at GX 102 at 5).[4]  Artis monitored Teeple's use of his personal

trading account and required him to verify compliance with the Code of Ethics every three

months.  (*See id*. at 6).

At Artis, Teeple reported directly to the portfolio manager of the fund, Stuart

Peterson, and to the senior analyst, Michael Harden.  As Lacey Dunne – analyst and head of

investor relations at Artis – testified, Teeple provided the information he received directly to

Harden and did not give it to the other analysts who worked at Artis for inclusion in the models

they developed to assist the hedge fund in making its investment decisions.  (Tr. 1246).

Teeple and Harden would work together to obtain inside information from various

public companies for use by Artis.  Harden had inside contacts at numerous technology

companies, including Qualcomm Inc., Atheros Inc., Broadcom Corporation, Marvell, Research

in Motion Limited, and Nvidia Corporation, and he and Teeple would discuss information he

obtained from those sources.  (*See* Exhibit B hereto at 5-7).  In addition, Harden gave Teeple a

prepaid cellular telephone to use for contacting employees at public companies.  (*See* Exhibit I at

GX 2502-T at 3).  As Teeple pointed out to Government witness Karl Motey, a prepaid cell

phone would be an invaluable way to contact employees without using a telephone number

subscribed in your own name.  (Exhibit I at GX 2502-T at 4-5).  This would allow the user to

escape detection by the Investor Relations department at companies, which is tasked with

ensuring that company employees are not speaking to members of the investment community

without explicit approval from corporate executives.  (*Id.* at 3-4).  As Teeple observed:

---

[4]       GX references herein are to Government Exhibits introduced at Riley's trial.  A complete set of the trial exhibits referenced herein are attached, in numerical order, as Exhibit I. Other documents bearing exhibit numbers were marked in connection with the Riley trial but were not introduced as exhibits.

> And there's no, there's no record. Your name – you can be
> anybody you want. You can register that phone as Dan Marino,
> you know, or whoever the fuck you want today. (Chuckles). . . .
> [E]ven if they find, if they find that number, then you just frickin'
> dump that one, go get another one and, and they'll assign you
> another number, right? (Chuckles)

(*Id.* at 5).

While at Artis, Teeple continued to obtain inside information about Foundry from
Riley. But instead of passing it to the Field Check Group's client base, Teeple now provided this
information only to Peterson and Harden. On the morning of September 27, 2007, just a few
days before Teeple officially joined Artis as an employee, Riley told Teeple that Foundry was
going to have one of its best quarters ever. (PSR ¶ 14). After that meeting, Teeple quickly
called Harden and relayed the news. (*Id.*). Ten minutes later, Artis began buying large amounts
of Foundry stock and engaging in bullish options trading. (*Id.*). This trading represented a
reversal of the bearish trading that Artis had been engaged in over the previous few days. (*Id.*).
When Foundry announced a doubling of its profits on October 25, 2007, Artis made over a
million dollars on Teeple's information. (*Id.*).

On February 28, 2008, Riley and Teeple spoke again. (PSR ¶ 15). This time,
Riley provided Teeple with the current below-expectations Foundry bookings number that Riley
had obtained from the Foundry computer systems. (*Id.*). Later that day, Teeple called Peterson.
Seven minutes after that telephone call ended, Peterson and Harden discussed the negative
bookings information Teeple had provided. (*Id.*). Five minutes after that, Artis began placing
large orders to sell stock and to engage in bearish options trading. (*Id.*).

On April 3, 2008, Riley and Teeple met again. (PSR ¶ 16). Riley confirmed that
the first quarter financial information at Foundry—which he had accessed the evening before in
the company computer system—was still negative. (*Id.*). Shortly after the meeting, Teeple

called Harden.  And within minutes, Artis engaged in additional bearish equity and options

trading.  (*Id.*).  When Foundry announced on April 11, 2008 that it expected its financial

reporting to fall short of Wall Street expectations, Artis made profits and avoided losses totaling

approximately $6.1 million.  (PSR ¶¶ 16, 17).

 On July 16, 2008, Riley provided Teeple with additional Foundry financial

information.  (PSR ¶ 18).  But more importantly, Riley told Teeple that Brocade was going to

acquire Foundry and that the deal was going to be announced on July 21, 2008.  (*Id.*).  Riley also

gave Teeple an approximate purchase price.  (*Id.*).  Shortly after that meeting ended, Teeple

called Harden and provided him with the information.  (*Id.*).  While they were on the phone,

Artis immediately began unwinding a significant short equity position in Foundry and began

bullish options trading.  (*Id.*). Artis continued to trade bullishly in Foundry through July 21,

2008, the day the Brocade-Foundry deal was actually announced to the public.  (*Id.*).  Based on

Teeple's tip, Artis made profits and avoided losses totaling approximately $21 million.  (*Id.*).

 Not content to simply share this information with Artis, Teeple called an

additional fifteen people in the days leading up the public announcement of the deal.  (PSR

¶¶ 19, 20).  All fifteen ended up investing in Foundry stock and made money when the deal was

announced.  Each profited in accordance with his investment—some making thousands of

dollars, some making hundreds of thousands of dollars.  (*See* Exhibit I at GX 2257).

Collectively, the group made over a million dollars based on Teeple's Foundry stock

recommendations.  (PSR ¶ 20).  Most of the people Teeple spoke to had never traded Foundry

stock before.  While Teeple undoubtedly caused all of these trades with his calls to the investors,

some, including Andrew Miller, John Johnson, and Karl Motey, specifically recall that Teeple

told them the news that Brocade was going to acquire Foundry.  Miller, a friend of Teeple's from

a golf club, invested in Foundry stock and options after Teeple told him about the deal.  (Tr. 345-47).  Johnson traded bullishly in Foundry and bearishly in Brocade, anticipating (correctly) that the stock price of Foundry would go up and the stock price of Brocade would go down when the news became public.  (Tr. 97-101).  Motey received the tip from Teeple but refrained from trading on the information or passing it to others because it was so obviously "illegal" information and he feared getting caught by the SEC.  (Tr. 798).

On October 9, 2008, Riley told Teeple during a telephone conversation about negative developments in the Foundry-Brocade relationship that could impact whether the deal went through as had been previously announced.  (PSR ¶ 21).  Forty minutes after the telephone call ended, Teeple called Harden to relay the news.  (*Id.*).  Shortly thereafter, Artis began selling Foundry stock and trading bearishly in Foundry options.  (*Id.*).  Artis continued trading in a negative direction in Foundry over the next several days.  (*Id.*).

On October 16, 2008, during an in-person meeting, Riley confirmed for Teeple additional negative details surrounding the Foundry-Brocade transaction, particularly related to difficulties Brocade was experiencing in securing the financing necessary to accomplish the deal.  (PSR ¶ 22).  Shortly after the meeting, Teeple called Harden to convey the news.  (*Id.*).  Seven minutes later, Peterson instructed an Artis trader to "flatten" the fund's entire position in Foundry stock—that is, to sell every last share that they held in the company.  (*Id.*).  Over the rest of that day, Artis completely liquidated the 1.1 million share position that it held in Foundry.  (*Id.*).  Eight days later, on October 24, 2008, Foundry announced a delay of the shareholder vote to approve the Brocade deal because of "recent developments related to the transaction" (Exhibit I at GX 2620)—and the company's stock price immediately dropped by approximately forty

percent.  By selling more than 2 million Foundry shares between October 9 and 16, 2008, Artis avoided losses of more than $7.8 million.  (PSR ¶ 23).

In total, Artis made profits and avoided losses of more than $36 million based on Teeple's illegal tips regarding Foundry.  (PSR ¶ 24).  During this entire time period, Teeple was aware that his bonus would be determined in the sole discretion of Stuart Peterson, Artis's portfolio manager, and that one of the factors in determining his bonus would be his contribution to the success of the fund.  (Tr. 979, 1241; *see also* Exhibit C at 1-2).  Teeple also invested a significant portion of his own assets in the performance of the Artis funds.  As of July 2008, Teeple had approximately $1 million of his own money under management at Artis.  (*See* Exhibits D and E).  And as such, Teeple received regular reports from Artis as to the nature and the size of the positions the funds were taking—including positions in Foundry Networks.  (*See* Exhibits F and G hereto).

C.    **Teeple Obtained Inside Information from Two Additional Foundry Employees**

As set forth above, and as Teeple acknowledged during his plea allocution and in his plea agreement, the source of his most valuable Foundry-related inside information was David Riley.  But Teeple's thirst for inside information about public companies—and about Foundry in particular—is underscored by the fact that he cultivated *other* sources at Foundry besides Riley from 2005 to 2009.  Specifically, Terry Wright and Douglas Schultz, two sales managers at Foundry who testified at Riley's trial pursuant to nonprosecution agreements with the Government, provided Teeple with nonpublic regional bookings numbers concerning Foundry's sales business.  In 2007 and 2008, Wright was Foundry's Vice President of Sales for the western United States, and furnished Teeple bookings numbers for his region.  (Tr. 377, 396-98).  For most of the relevant period, from 2005 through the middle of 2008, Schultz was

Foundry's Regional Sales Director for Japan and Korea. (Tr. 901). He furnished Teeple with bookings numbers for his region, as well as with inside information about Foundry's Navy business—a sector headed by an individual with whom Schultz was friendly. (Tr. 912-14). As Wright and Schultz both testified at Riley's trial, their provision of bookings numbers to Teeple violated Foundry's insider trading policy. (Tr. 398; 913-14).

## DISCUSSION

Applying the factors set forth in Title 18, United States Code, Section 3553(a), a Guidelines sentence of 60 months' imprisonment is "sufficient, but not greater than necessary" to serve the goals of sentencing. Between July 16 and July 21, 2008, Teeple, starting from nearly the moment he learned of Brocade's impending acquisition of Foundry from David Riley, embarked on a veritable spree of tipping unparalleled in the recent spate of insider trading prosecutions in this District or in any other known insider trading case. This behavior demonstrates Teeple's brash, audacious disregard of the federal securities laws and any notion of fair play. The "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), thus weigh heavily in favor of a 60-month term of imprisonment. So, too, do the "history and characteristics of the defendant," *id.*, insofar as they are reflected in Teeple's sustained, calculated criminal conduct. As detailed above, July 16 to 21, 2008 was not nearly the first nor the last time Teeple sought, obtained, and passed material non-public Foundry business information. Finally, a 60-month sentence is needed here "to reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," and adequately deter similar conduct. 18 U.S.C. § 3553(a)(2). As such, the Court should reject Teeple's numerous attempts to minimize his role in the conspiracy. He was substantially more than a "conduit" (Teeple Mem. at 30) or a

13

"facilitator" (*id.* at 38) of the Foundry insider trading by his tippees; he was the linchpin of the scheme and to suggest otherwise is misleading and controverted by the record in this case.

## I.     APPLICATION OF THE GUIDELINES

The Government's plea agreement with Teeple sets his offense level at 27, which corresponds to a Guidelines range of 70 to 87 months' imprisonment.  Because Teeple was permitted to plead to only the conspiracy offense in Count One of the Indictment, the statutory maximum term of imprisonment is 60 months.  The parties have agreed to a Guidelines sentence of 60 months, and Teeple has agreed that this term of imprisonment is reasonable.

## II.     NATURE OF THE OFFENSE

Teeple engaged in serious and prolific illegal conduct over a period of several years and seemingly without hesitation or remorse.  His conduct directly led to tens of millions of dollars of ill-gotten gains, secured for himself illegitimate income and bonus payments, and caused harm to Foundry and Brocade shareholders who were not privy to the inside edge he provided to Artis and others.  Perhaps most importantly, his offense compromised the integrity of the securities markets and corrupted the even playing field that ordinary investors demand and deserve.

Teeple does not deny the seriousness of his offense conduct.  He does, however, repeatedly attempt to downplay his obvious prominence in the charged conspiracy and to suggest based on an incomplete rendering of the Government's evidence against him that his conduct pales in comparison to the numerous other defendants who have been convicted of insider trading in this district during the last five years.

As detailed further below, Teeple was indisputably a central figure in the charged conspiracy.  He repeatedly sought and obtained inside information from Riley and others at

Foundry, and he caused Artis and all of his other tippees to profit handsomely based on that information.  Teeple's rampant involvement in insider trading in Foundry over a period of at least four years places his conduct beyond that of many of the other recently-convicted insider trading defendants.

### A.      Teeple Was Prohibited from Trading in Personal Accounts By Artis

Teeple notes a few separate times in his submission that he did not trade Foundry securities in any personal accounts controlled by him or his family members and argues that this lack of personal trading shows that he "was not motivated by greed or direct financial gain" to conspire to commit insider trading (Teeple Mem. at 30, 36, and 38).  Teeple fails to inform the Court, however, that he was prohibited from trading any securities in personal accounts or encouraging family members to do so as a term of his employment at Artis—and faced termination by Artis if he did so without Artis's express authorization.

Artis's Code of Ethics states in very clear terms, "[g]enerally, no Employee may purchase or sell, or allow the Employee's Family Members to purchase or sell . . . any security during the employee's employment with [Artis]."  (Exhibit I at GX 102 at 5).  Further, Artis tracked all activity in Teeple's (and every other Artis employee's) personal trading accounts and required employees to verify compliance with the policy on a quarterly basis.  (*Id*. at 6).  In fact, Artis's Chief Compliance Officer asked Teeple to verify his compliance on July 8, 2008, about one week before he received the Brocade acquisition tip from Riley. (*See* Exhibit H).

Teeple's decision to not trade in his personal accounts or to encourage family members to do so was therefore based on his interest in remaining employed and was not, as he now suggests, an exercise of restraint or moderation concerning the Foundry inside information he received.  In fact, he was motivated by greed and direct financial benefit in passing the

15

Foundry information to Artis.  He knew that his year-end bonus would be determined based on the performance of Artis's funds and on his personal contributions to Artis's business as determined by Peterson, one of the people to whom he passed the Foundry inside information. (Tr. 979, 1241).  As Teeple explained to Karl Motey during a recorded meeting on April 29, 2009, "I know if . . . if [Artis doesn't] put up a big year I . . . I'm not gonna get any kind of big bonus or anything . . . It's all tied to performance."  (Exhibit C at 1).  In addition to his interest in obtaining a "big bonus" from Peterson, as of July 2008, Teeple had approximately $1 million of his own money invested in Artis funds.  (*See* Exhibits D and E).

Beyond the direct financial gain he obtained from causing Artis to trade Foundry securities based on illegal inside information, Teeple also stood to gain by encouraging his numerous contacts at other technology companies to invest in Foundry before the deal with Brocade was announced.  By enriching these contacts at other companies in Artis's portfolio of holdings—Juniper Networks, Marvell, Network Appliance, and Cisco Systems—Teeple hoped they would be more forthcoming with information about their respective companies and thus enhance his ability to obtain helpful information for Artis.

### B.   Teeple's Attempts to Minimize His Role in Artis's Foundry Trading Decisions Should be Rejected

During 2007 and 2008, Artis repeatedly entered large trades to either purchase or sell Foundry stock and options almost immediately after Teeple spoke to Peterson or Harden and sometimes while he was still on the phone with one of them.[5]  This dynamic is captured in an April 3, 2008 instant message from Harden to Peterson, sent just minutes after Teeple provided

---

[5]      As detailed in the Government's May 1, 2014 Bill of Particulars, Artis traded Foundry securities shortly after talking to Teeple and shortly after Teeple talked to Riley on at least twelve occasions during 2007 and 2008.  The Government did not allege passage of material nonpublic information by Teeple for all of these occurrences.

the Foundry tip to Harden that forms the basis of Count Two of the Indictment, and just seconds after Artis, based on this tip, entered an order to short sell more than 800,000 shares of Foundry stock.  (*See* Exhibit I at GX 23).  In the message, Harden writes, "srry – I'll keep that more quiet – I'm just used to having to rush when matt's on phone!"  (*Id.*).   As this message—and the many other instances, described above and in the PSR, in which Artis began significant trading in Foundry following telephone calls from Teeple—shows, Harden and Peterson anxiously awaited receiving Foundry information from Teeple, and when he provided it, Artis traded almost immediately, without any conceivable time for separate research, analysis, or consultation.

Despite all of this evidence to the contrary, Teeple still repeatedly attempts to distance himself from Artis's Foundry trading decisions and to minimize the impact the information he provided had on Artis's trading decisions.  He attaches unfounded significance to the fact that he "did not himself execute, formulate, or direct" (Teeple Mem. at 38) any of the Foundry trades at issue and attempts to characterize himself as simply a "conduit of information" between Riley and "others who traded" (*id.* at 30) and "merely a facilitator for trading decisions made solely at others' discretion" (*id*. at 38 n. 21).  These characterizations are false.  As explained above, Artis on many occasions made enormous Foundry trades on Teeple's prompting and apparently based solely on illegal inside information that he provided.  Further, nearly all of the more than 15 individuals who traded Foundry securities in July 2008 after speaking to Teeple had never previously held a position in Foundry.  Teeple is the reason Artis made all of the Foundry trades at issue.  And Teeple is the reason why all of his business contacts, friends, and neighbors bought Foundry stock between July 16 and 21, 2008.

Teeple also wrongfully asserts, in an effort to distance himself from Artis's approximately $36 million in Foundry trading profits based on his illegal tips, that he "was not

even aware of the size of the trades being placed by [Artis] at any given time" (Teeple Mem. at

38), and "had no control over the scale of any trades placed by [Artis] or whether his employer

would execute trades in the first place." (*Id*. at 28).  First, as an Artis employee who invested in

Artis funds, Teeple did have access to Artis's position in every stock in its portfolio on a daily

basis.  An Artis trader would send Real-Time Portfolio Monitor (RPM) reports to employees,

including Teeple, by email.  (*See* Exhibits F and G).  These reports provided daily position and

performance information for all of the securities in Artis' funds, including its then-current

Foundry position.  These reports, in addition to his knowledge of the overall dollar value of

Artis's portfolio and the fact that he had received $2 million just to join Artis (*See* Exhibit A),

fully informed Teeple of the "scale" of Artis's trading and the potential profits it might collect

based on the Foundry inside information he provided.[6]  Second, Teeple's contention that he had

no control over whether Artis would "execute trades in the first place" is absurd and irrelevant in

the context of the extremely valuable inside information he was providing.  Teeple knew that his

illegal edge would drive large trades, leading to large profits.

### C.   Teeple Wrongly Asserts That His Non-Foundry Work Was Limited to "Otherwise Legitimate Research"

The Court need only review Teeple's May 26, 2009 recorded telephone

conversation with Karl Motey, in which Teeple encourages Motey to purchase a prepaid,

untraceable cell phone to obtain inside information from contacts at Marvell, to know that Teeple

was not the legitimate analyst described in his sentencing memorandum.  (*See* Exhibit I at GX

---

[6]     Furthermore, one of the individuals that Teeple tipped concerning the Brocade acquisition was Ronald Dennis, an analyst at an affiliate of S.A.C. Capital Management, L.P., then well known as one of the largest hedge funds in the world.  Though Teeple is correct that his offense level is highly dependent on the calculation of profits and avoided losses, he was certainly well aware that in tipping significant hedge funds like S.A.C. Capital and Artis, which at the time had approximately $2 billion under management, his conduct could lead to extremely large profit and loss avoidance totals.

2502-T; Teeple Mem. at 31-32).  During that same conversation with Motey, Teeple noted that

Harden had given him a prepaid cell phone and that Harden also had one.  *Id*.  Teeple also told

Motey during other recorded calls about his own sources of nonpublic information at Marvell

and Palm, Inc., and he references several of Harden's sources of nonpublic information at

companies like Nvidia, Research in Motion, and Atheros, among others.  (*See* Exhibit I at GX

2504-T; Exhibit B 5-7).

       These recorded calls contain Teeple's own descriptions of his work and the work

of Harden, his closest colleague at Artis as of 2009.  The descriptions are completely at odds

with the offered depiction of Teeple's work in his sentencing memorandum as an otherwise

legitimate analyst who "crossed the line into the exchange of illegal inside information" with

only one source at one of the companies he covered.  *See* Teeple Mem. at 31-32.  As the

recorded calls and the testimony of John Johnson, Terry Wright, and Douglas Schultz

demonstrate, Teeple's efforts to obtain inside information from contacts at public companies

extended far beyond David Riley.  (Tr. 68-71; 396-398; 913-914).

       There is no dispute that the work of legitimate market analysts, especially those

who write reports that are available to the investing public, is "generally recognized to inure to

the benefit of the broader investing public."  Teeple Mem. at 31.  Teeple's work for Artis,

however, which mainly involved traveling to Silicon Valley to obtain information from

technology company employees who were not authorized to speak about their company's

business information with investment analysts, benefited only a select few: Artis, Teeple's

friends and contacts, and – of course – Matthew Teeple.[7]

---

[7]    Teeple makes much in his sentencing submission of the fact that he did not
*himself* breach a fiduciary duty to Foundry when he obtained and passed material, nonpublic
information about the company to others to enable illegal trading.  *See, e.g.*, Teeple Mem. at 36.

D.     **Several of the Individuals Who Submitted Letters on Teeple's Behalf Profited from Teeple's Knowledge of the Brocade Acquisition and/or Were His Contacts Inside Public Companies**

The Government does not dispute the authenticity of the positive depictions of Teeple's character in many of the numerous letter submitted to the Court on his behalf, and this is especially true of the letters submitted by family members.  The Court should be aware though that several of the letters, as detailed further below, were written by individuals who profited from trading Foundry securities between July 16 and 21, 2008 at Teeple's prompting and/or were his contacts inside other publicly-traded technology companies.  For example:

- Frank Czyz (Teeple Mem. Ex. 40): Czyz was a sales employee at NetApp, Inc. in 2008. He purchased 8,000 Foundry shares on July 16, 2008 while he was on the telephone with Teeple and later purchased Foundry call options.  Czyz obtained profits totaling more than $70,000 from this Foundry trading.  (Exhibit I at GX 2246).  Teeple also sought and obtained NetApp business information from Czyz in 2008.  In 2014, upon learning that Czyz had provided NetApp information to Teeple, NetApp fired Czyz.

- Kumar Mehta (Teeple Mem. Ex. 25): Mehta was employed by Juniper Networks in 2008. On July 17, 2008, Mehta purchased 1,000 shares of Foundry stock shortly after speaking to Teeple; on October 17 and 20, 2008, Mehta sold 700 shares of Foundry stock shortly after speaking to Teeple.  Mehta obtained profits totaling more than $8,000 from this Foundry trading. (Exhibit I at GX 2253).

- Joseph DeFranco (Teeple Mem. Ex. 49): DeFranco was employed by Marvell as of 2009. During a May 26, 2009 recorded call with Motey (Exhibit I at GX 2502), Teeple informed Motey that he had obtained information from DeFranco concerning Marvell's sales performance during the then-pending fiscal quarter.

---

As Teeple must concede, however, his use of the Foundry inside information rendered him a participant – indeed, a necessary and critical participant – in Riley's original breach.  *See* Teeple Mem. at 37 (citing *Chiarella* v. *United States*, 445 U.S. 222, 230 n. 12 (1980) (tippee's obligation arises "from his role as a participant after the fact in the insider's breach of a fiduciary duty").  While Teeple quotes *Bateman Eichler* v. *Berner*, 472 U.S. 299, 313 (1985), for the proposition that "[a]bsent the tipper's misconduct, the tippee's trading would not occur," the same is absolutely true for Teeple here.  Absent Teeple's repeated illegal efforts to obtain and disseminate confidential inside information, the remote tippees in this case would not have traded in Foundry and profited to the tune of $36 million.

- AJ Shanley (Teeple Mem. Ex. 12): Shanley purchased 222 shares of Foundry stock on July 21, 2008 (prior to the announcement of the Brocade acquisition) shortly after speaking to Teeple, obtaining profits of approximately $1,000.

- Walter Stringfellow (Teeple Mem. Ex. 26): Stringfellow's wife purchased 1,000 shares of Foundry stock on July 21, 2008 (prior to the announcement of the Brocade acquisition), obtaining profits of more than $4,000. The Stringfellows lived next door to Teeple at the time.

- RB Alexander (Teeple Mem. Ex. 51): Alexander purchased Foundry stock on July 18, 2008, obtaining profits of approximately $3,000. Alexander purchased Foundry, like other securities, based on Teeple's recommendation. At the time, he lived in Teeple's neighborhood and had served as the real estate broker when Teeple purchased his home.

## III.   OTHER SENTENCING CONSIDERATIONS

Of course, severity of the offense conduct is not the only consideration at sentencing. The Court must also consider the history and characteristics of the defendant, as well as the need for the sentence to further the goals of, among other things, promotion of respect for the law, just punishment, and adequate deterrence. *See* 18 U.S.C. § 3553(a). Like the nature of the offense conduct, these other considerations support imposition of a 60 month sentence, and weigh against any variance.

Aspects of Teeple's character are no doubt reflected in the many positive letters submitted to the Court on his behalf, and the burdens his family faces in the future are meaningful. Yet from the time of his crimes through today, Teeple has enjoyed advantages that few who come before this Court for sentencing could ever dream of having. Despite these advantages, he chose to engage in serious criminal activity – time after time – that allowed him to obtain even more money and related benefits. Far from "stepping over the line" for a moment in a pique of bad judgment, Teeple repeatedly violated the federal criminal securities laws for the better part of four years to help line his pockets.

Turning to the desire to promote respect for the law and afford adequate

deterrence, the Government respectfully submits that these factors also militate in favor of the 60-month sentence the parties promised to seek in the plea agreement.  Teeple's crime was not one of need.  Teeple was a well-compensated member of the investment community who lived in a good neighborhood and had strong family support.  He did not need to engage in insider trading to "better his situation," beyond a simple and brazen desire to make more money, at the expense of Foundry, its shareholders, and the larger investment community.  He determined the money was worth the risk, and he repeatedly decided to break the law.  In order to deter comparable choices by other white collar criminals – who of all defendants, can be best assumed to be coldly calculating the risk versus reward of their crimes – a significant incarcerative sentence is appropriate in this matter.

Finally, and relatedly, the Government submits that reference to other insider trading cases as guideposts in evaluating the proper sentence here is of limited utility.  (Cf. Teeple Mem. at 37-39).  This District has not seen an intermediate tippee as prolific as Matthew Teeple – someone who eagerly sought, passed, and used inside information from multiple sources time and again.  Teeple caused more than fifteen people to trade based on the Brocade-Foundry acquisition information alone.  Teeple repeatedly provided inside information to Artis Capital, causing them to reap more than $30 million in profits and avoided losses.  Teeple himself enjoyed the derivative benefits from those trades, both in his salary, his sizable bonuses, and through his own significant personal investment in Artis funds.  Teeple himself admits that he was "swept up" in the culture of illegality in Silicon Valley, and may have "engaged in *other* improper communications as well."  (Teeple Mem. at 36 (emphasis added)).  These realities led the parties to resolve the charges against Teeple through the plea agreement, which explicitly

states that neither Teeple nor the Government will seek any sentence other than 60 months' imprisonment in connection with this matter.

For all the reasons set forth above, such a sentence is appropriate.

## IV.     RESTITUTION AND FORFEITURE

At the time of his plea, Teeple agreed to forfeit to the Government the sum of $553,890.  (PSR ¶ 95).  A preliminary consent order of forfeiture was entered at that time, and the Government will request that the Court enter a final order of forfeiture in the same amount at sentencing.

As the Pre-Sentence Report observes, there have been no claims made for restitution to date.  Counsel for Brocade Communications, however, has advised the Government that they are considering whether to submit a claim.  In the event that Brocade informs the Government that they are submitting a claim, we will let the defendant, the Probation Office, and the Court know as soon as possible.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the

Guidelines sentence agreed upon by the parties in the plea agreement of 60 months'

imprisonment is appropriate.  In addition, the Court should award forfeiture to the United States

Government in the amount of $553,890.

DATED:      October 9, 2014
              New York, New York

                                  Respectfully submitted,

                                  PREET BHARARA
                                  United States Attorney

By: ___/s/_____
        Telemachus P. Kasulis
        Sarah E. McCallum
        Assistant United States Attorneys
        Tel. (212) 637-2411 / 1033

        Michael P. Holland
        Special Assistant United States Attorney